IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| WAYNE THOMAS, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. H-22-2001 |
| § | |
| 5860 SAN FELIPE, LTD., § | |
| § | |
| Defendant. § | |

**MEMORANDUM AND OPINION**

This is a public accommodation case brought by a "tester" who alleges that a strip mall in Houston, Texas violates the Americans with Disabilities Act. 42 U.S.C. § 12101, *et seq.* After a bench trial and review of a voluminous record of architectural and construction information, expert analysis, and other documents, the court finds and concludes that Mr. Thomas has standing. The Property at issue, 5860 San Felipe Ltd., was build in 1975. Although it is "grandfathered" as an existing facility, it has made some modifications toward compliance with the current ADA requirements. The Property manager agrees that the Property does not meet the current ADA requirements.

The plaintiff, Mr. Thomas, urges that 5860 San Felipe must make a number of other extensive modifications, including converting at least two existing parking spaces into handicap accessible spaces; regrading the entire parking lot; regrading the entire sidewalk area that runs in front of all the stores; and putting automatic door openers on the door of each store. The court finds and concludes that 5860 San Felipe must make the readily achievable modification to the

curb ramp but is not liable for adding additional handicap accessible parking spaces, regrading the parking lot or sidewalks, or making other modifications requested by Mr. Thomas.

The findings and conclusions leading to this result are set out below.

## FINDINGS OF FACT

### I. The Parties

Wayne Thomas, the plaintiff, is permanently paralyzed from the waist down and uses a wheelchair. (Docket Entry No. 49 at 6). Mr. Thomas lives in Houston, Texas. He lived 10 miles from the property at issue and now lives approximately 12 miles away. (*Id.* at 7).

The property at issue is a strip shopping mall at 5860 San Felipe St. ("the Property"). It was built in 1975 and complied with the 1970 Houston Building Code. (Docket Entry No. 66 at 16:2-5). That was long before the ADA requirements were put into place. Properties built before those requirements are considered "existing facilities" and could retain their pre-ADA configurations. 28 C.F.R. § 35.104; 28 C.F.R. § 35.151(b). If, however, significant changes are made, the "existing facility" status is lost and the property must comply in all respects with the ADA.

The Property contains multiple tenant stores and restaurants, including food chains such as Fu's Garden Chinese Restaurant, Southwell's Hamburger Grill, and TCBY, and a women's clothing store called Swoon. (Docket Entry Nos. 49 at 7; 66 at 42:25-43-1; 46:2-21). Restaurants on the Property, including Southwell's and TCBY, offer take-out as well as dine-in options. (Docket Entry No. 66 at 188:18-20).

The Property has 88 total parking spaces, two of which are designated for accessible parking. (Docket Entry No. 66 at 149:5-7). Although the City's Code requirements mean that the Property's parking lot must have at least 104 parking spaces, because the site was built years

prior to the regulation, it was grandfathered in as a legal non-conforming property with its current layout, number of spots, and property usage. (*Id.* at 155:11-156:5). The number of parking spaces is inadequate for the demand; there are not enough spaces for the customers of the restaurants and stores, particularly at such peak times as the lunch and dinner hours. (*Id.* at 159:16-160:6; 163:1-4).

During the trial, counsel for the Property disclosed that it had relocated one of its accessible parking spaces from a location near the road to a location close to the handicap ramp leading from the parking lot to the stores. (Docket Entry No. 66 at 87:11-23; 186:7-14). The Property clearly striped and marked the two handicapped parking spaces that are now on either side of the ramp and as close as possible to the store entrances. (Docket Entry No. 63-9 at 20, 28, 64). The Property did not change the number of accessible parking spaces, did not alter the slope of the parking lot or the parking spaces, and did not alter the access aisle or curb ramp. (Docket Entry No. 66 at 87:11-23). The parking space was relocated to a location easier and more convenient for use by handicapped patrons by repainting the parking spot lines and handicap markers. (*Id.*).

## II. Mr. Thomas's Experience at the Property

Mr. Thomas testified that he first visited the Property because it was located within a mile of his brother's residence and "[he] got hungry coming home." (Docket Entry No. 66 at 29:10-14; 50:15-17). He testified that "the burgers [at Southwell's] are pretty good" and he "was going to go back." (*Id.*). Mr. Thomas testified that he has also bought lottery tickets at the Special K convenience store located on the Property. (*Id.* at 32:6-8). Lottery tickets can be found at many locations in Houston, including at locations far closer to Mr. Thomas's home. There is a Southwell's closer to his current home, but he testified he liked the way the burgers were

3

prepared at the more distant restaurant at the Property. (*Id.* at 52:13-16, 71:21-25). Mr. Thomas also testified that he wanted to return to the Property to shop at Swoon, but that was before he realized it was a women's clothing store. (*Id.* at 46:20-47:1). He then said that he might shop for gifts for his mother and girlfriend at that store but conceded that he had never been inside. (*Id.* at 47:2-11).

Mr. Thomas testified that he has visited the Property "three to five times" in the twenty years he has lived in Houston. (*Id.* at 29:10-17). During these visits, Mr. Thomas encountered difficulty getting from the parking lot into the stores. Mr. Thomas testified that of the two designated accessible spaces, one of the spaces was dangerously close to the road and lacked an access aisle (the space that has since been moved to be closer to the ramp leading to the stores and away from the road), and the other space had an excessive slope and a curb ramp that was difficult to navigate in his wheelchair. (*Id*. at 29:21-30:10, 30:14-20) (the parking space near the Chinese restaurant "didn't have enough access out. So I had to do the same thing. Back up . . . to make sure my chair don't roll backwards."). Mr. Thomas also testified that the sidewalk in front of several of the shops and restaurants was sloped downwards in the areas outside the door used for entry and exit. Mr. Thomas testified that "[w]hen I opened the door [to enter a shop or restaurant] I realized I was moving back. I had to hold on to the door, use my right hand to turn to get in there. Normally, I can just swing the door open, but I had to use it." (*Id.* at 31:1-10).

Finally, Mr. Thomas testified that the ramp that allowed wheelchair access from the parking lot to the sidewalk leading to the store entrances was excessively sloped, did not have edge protection, and was partially blocked by other vehicles during his visit. He testified that "the problem with that was that ramp was basically blocked. [We] had to wait for a car to come out of it . . . It didn't have access out to it. When I did use that ramp, I had to be very careful

4

because of the steepness of it." (*Id*. at 30:1-10). When he left the shops and used the ramp to get from the sidewalk in front of the shops to his car in the handicapped parking spaces, he testified that "[b]ecause of the steepness, I came down it fast and went into the parking lot. I really had to pay attention to keep from going off on the edge because it didn't have any edge protection on it neither." (*Id*. at 31:14-17).

Although Mr. Thomas does not live near the Property, he testified that he intends to return once he is healed from a pressure sore injury. Mr. Thomas explained that "there is a store next to the burger place that I want to go into. They have all types of stuff that they sell . . . I will be back . . . The food was good." (*Id*. at 32:21-33:3). Mr. Thomas's brother no longer lives near the Property, but Mr. Thomas has stated that he is "not worried about what is close to [him]" and that he will go back to the Property because he likes the particular way the burgers are prepared at the Southwell located there, even though there is a Southwell much closer to his home. (*Id*. at 51:2-3, 12-14, 20-21; 52:1-2). When questioned as to why he could not get a burger at the closer location of the same chain, Mr. Thomas explained that "they don't have the same chef at every location…[t]he burger might not be made the same way [at another location.]" (*Id*. at 51:14-52:2).

Mr. Thomas has previously brought cases against privately owned retail outlets and public places around Houston. He recalled suing the Houston Zoo, Katy Mills Mall, Cypress Village, and Houston Premium Outlets, among others. (*Id.* at 36:17- 37:1; 40:20-41:5, 68:15-20; 72:9-21). Mr. Thomas testified that he revisits these properties and others he has sued to "see if the changes are made" and to "go shopping over there." (*Id.* at 73:24-74:11). Mr. Thomas has brought a total of 83 suits as an ADA tester in the Houston area. (*Id.* at 21:16).

5

### III. The Feasibility of Modifications

At trial, Mr. Thomas presented an architect, Patrick Sullivan, who testified as an expert on modifications required to meet ADA requirements. (Docket Entry No. 66 at 81:15-20). Mr. Sullivan testified as to the modifications needed to bring the Property into ADA compliance. The Property rebutted this testimony with evidence that the modifications would cause severe economic harm to the Property's tenants and therefore to the Property itself.

Mr. Sullivan visited the Property once before his testimony. (*Id.* at 116:4-6). He did not consult with the Property's landlord or confirm whether the modifications he testified to would be feasible under either the City of Houston's existing regulations. Nor did he know the effect of the loss of parking spaces and disruptions caused by the construction work needed to implement the changes he testified to. (*Id.* at 122:9-12).

Mr. Sullivan first testified that there needed to be two more handicap accessible parking spaces, for a total of four. (*Id.* at 139–40). These additional accessible spaces would bring the property in line with ADA regulations but would result in the loss of two regular parking spaces. (*Id.*). The Property showed that reducing the number of regular parking spaces would violate the City of Houston Code, because the Property already has fewer spaces than the Code requires. (*Id.* at 116:4-6). The loss of two parking spaces would also cause significant hardship to tenants. Brian Bernstein, the Property's manager, credibly testified that if the number of nonhandicapped parking spaces were reduced, restaurant tenants would likely leave the Property because they are so dependent on having adequate parking for their customers, especially at peak times for customer demand. (*Id.* at 168:4-5). Mr. Bernstein testified that the burden on the tenants would likely result in their leaving the Property and would result in irreparable harm to the Property's finances. (*Id.* at 159:16-160:20; 161:8-13; 168:10-13). Mr. Bernstein also testified that the

6

Property would not be able to obtain new, non-restaurant tenants without losing its grandfathered status, which is based on the Property's current uses. (*Id.* at 161:16-162:5, 167:20-168:13). Mr. Bernstein testified that the regular parking spaces are heavily used, while there is rarely a car parked in either of the two handicap accessible spaces. (*Id.* at 163:1-6).

Mr. Sullivan also testified that the entire parking lot should be regraded because it slopes downward. The current parking lot slope has a maximum slope grade of 6% with a .4% grade differential across the Property. (*Id.* at 138:3-6). Mr. Sullivan stated that the appropriate gradient for the accessible spaces was 2%. (*Id.* at 138:13-16). The Property argued that this would raise three issues. First, reducing the gradient, or slope grade, of the parking lot would increase the difference in the height between the parking lot and the ramp or steps to the sidewalks in front of the stores. That would in turn cause a tripping hazard. (*Id.* at 140:12-141:10). Second, making that gradient change in the parking lot would increase the risk of heavy flooding during the many storms Houston experiences every year. The Property's lot gradient is designed to promote sheet drainage and minimize the risk of flooding. (*Id.* at 116:4-6). This increased risk of flooding could also increase the risk that the City of Houston would not approve the proposed revisions to the parking lot gradient. (*Id.* at 161:8-13). Third, the proposed construction work needed to change the ramp, the parking lot, and the sidewalks as Mr. Sullivan testified would take multiple weeks to complete, disrupting the business of tenants by making it more difficult for their customers and employees to park and access the restaurants and stores in the Property. (*Id.* at 122:4-8). Mr. Bernstein testified that it could take up to four weeks to complete the construction. (*Id.* at 161:3-5).

Although Mr. Sullivan testified that the construction necessary to make the changes he thought were necessary for ADA compliance would only take a few days, this testimony was not

7

credible. Mr. Bernstein's work as a property manager for different properties in the Houston area made his estimate of the time the proposed construction would take far more credible than Mr. Sullivan's estimate of a few days. Mr. Bernstein testified that although his property management company had the money necessary to complete the construction, that did not represent the full risk of economic damage to the Property. If the construction took a week or more, the disruption to tenant spaces and the resulting reduction in the number of regular parking spaces would cause tenants to leave. (*Id.* at 167:3-168:13). Although the Property has the cash to do the repairs, it does not have the resources to absorb the loss of tenant defections due to business interruption from construction and from the reduced number of parking spaces.

Mr. Sullivan denied that there would be any increased risk of flooding from the changes to the parking lot he proposed, but he acknowledged that the parking lot and sidewalk and ramp regrading might create business disruptions for the Property tenants. (*Id.* at 110:6-12; 146:4-12). In addition to the parking lot, Mr. Sullivan suggested leveling the sidewalk in front of the Property's businesses. (*Id.* at 104:17-21). The Property argued that this would ultimately create an undulating sidewalk that does not comply with the ADA and would create tripping hazards. (*Id.* at 166:5-10). Mr. Bernstein credibly testified that leveling the sidewalk in front of all the tenants' stores would be highly disruptive to the tenants' business. (*Id.* at 160:14-20). Mr. Bernstein also credibly testified that it would be a large project that would take weeks to complete, further undermining Mr. Sullivan's testimony that the construction displacement and disruption would last a far shorter amount of time. (*Id.* at 161:3-5).

Mr. Sullivan's experience as an architect made his testimony that the Property's parking lot and sidewalks could be leveled, more handicap parking added, and the ramp made less steep in a manner complying with the ADA credible. But Mr. Sullivan is not an expert on the effect

8

on the Property's tenants that the construction required to make all these changes and the loss of regular parking spaces would cause. Nor is he an expert on the Property's need to have the parking lot sloped to handle flooding concerns. Mr. Bernstein credibly testified that regrading the parking lot and sidewalk and losing regular parking spaces would present a hardship to the business operations of the Property. He also credibly testified that regrading the parking lot would increase the risk of flooding during one of Houston's famous heavy storms, tropical storms, and hurricanes. (*Id.* at 153:19-154:9).

Mr. Sullivan also suggested remodeling the curb ramp near one of the restaurants so that the ramp would not protrude into the access aisle of the handicap accessible parking spaces. Mr. Sullivan testified the sidewalk has "usable space for an extension of the sidewalk and a dropdown-style curb ramp, which would clear the parking space, and that would be a compliant way to approach it." (*Id*. at 93:13-96:6). Mr. Sullivan suggested that if the dropdown ramp did not work, "a parallel-style curb ramp" could accommodate "space constraints[.]" (*Id.* at 147:10-11). During cross examination, Mr. Sullivan acknowledged that cutting in a ramp might "cut[] into [tenants'] ability to put out tables or display merchandise," but he also testified that the ramp could be located in a way that would minimize or prevent that intrusion. (*Id.* at 150:2-15). The Property did not put forward evidence beyond this potential intrusion on tenants' ability to use the sidewalk that modifying the curb ramp would negatively impact the Property's use.

Mr. Sullivan proposed installing automatic door openers at the entrance of each of the Property's businesses. (*Id.* at 111:4-5). Mr. Bernstein testified that only the tenants, not the Property manager, had the authority to make such a change; the Property cannot require tenants to make modifications to the doors under its existing leases. (*Id.* at 177:2-5). The court finds that whether to install automatic door openers is not within the Property's authority to decide.

9

Finally, Mr. Sullivan proposes removing the bollards in front of Fu's Garden, a restaurant, in order to bring the handicap accessible parking spots in front of the restaurant into compliance with current ADA requirements. (*Id.* 94: 10-23, 132:1-5). The Property presented evidence that the bollards were in place to prevent cars from running into storefronts; Southwell's had previously suffered such a storefront crash. (*Id.* 132:10-13; 179:25-180:7). Mr. Sullivan admitted to knowing that businesses have been sued for the absence of bollards following crashes. (*Id.* at 132:6-133:3). This court finds that removing the bollards would expose the Property to significant liability and is not a viable modification.

## CONCLUSIONS OF LAW

**I.     Standing**

Federal courts have jurisdiction only over "cases" or "controversies." U.S. Const. Art. III, § 2, cl. 1. To establish a "case or controversy," a plaintiff must show that he has standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018). "The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). "The irreducible constitutional minimum of standing contains three elements:

> (1) The plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision.

*Morgan*, 879 F.3d at 606 (quoting *Lujan*, 504 U.S. at 560–61) (quotation marks omitted).

An ADA plaintiff may establish standing to seek prospective relief in two ways. First, he may show that he "intends to return to the allegedly noncompliant public accommodation and therefore faces a real and immediate threat that []he will again be harmed by ADA non-

10

compliance." *Hunter v. Branch Banking & Tr. Co.*, 2013 WL 4052411, at *2 (N.D. Tex. Aug. 12, 2013); *see Deutsch v. Annis Enterprises, Inc.*, 882 F.3d 169, 173 (5th Cir. 2018) ("'Merely having suffered an injury in the past is not enough; the plaintiff must show a 'real or immediate threat that the plaintiff will be wronged again.'" (quoting *Lyons*, 461 U.S. at 111)).

In assessing a plaintiff's "intent to return," courts consider the following four, non-exclusive factors: "(1) the proximity of the defendant's business to the plaintiff's residence, (2) the plaintiff's past patronage of the defendant's business, (3) the definitiveness of the plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the defendant." *Hunter*, 2013 WL 4052411, at *2. The second way an ADA plaintiff may establish standing is by showing that he "is continually injured by being deterred from making use of the allegedly noncompliant public accommodation." *Id.* "Just as a disabled individual who intends to return to a noncompliant facility suffers an imminent injury from the facility's existing or imminently threatened noncompliance with the ADA, a plaintiff who is deterred from patronizing a store suffers the ongoing actual injury of lack of access to the store." *Chapman v. Pier 1 Imports*, 631 F.3d 939, 950 (9th Cir. 2011) (internal quotation marks and citation omitted).

A "tester" plaintiff may have standing to bring a Title III case. *Gilkerson v. Chasewood Bank*, 1 F. Supp. 3d 570, 596 (S.D. Tex. 2014); *Betancourt v. Federated Dep't Stores*, 732 F. Supp. 2d 693, 710 (W.D. Tex. 2010); *see also Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 273 (5th Cir. 2021) ("Laufer's assumed status as an 'ADA tester' does not absolve her of the need to show an injury in fact for standing purposes."). That the plaintiff was motivated in part to generate a lawsuit to bring a public accommodation into compliance with the ADA does not preclude a finding of standing. *Gilkerson*, 1 F. Supp. 3d at 596; *Betancourt*, 732 F. Supp. 2d at 710.

Case 4:22-cv-02001   Document 72   Filed on 07/11/24 in TXSD   Page 12 of 18

Mr. Thomas has showed both that he visited the Property several times in the past and intends to visit the Property again. (Docket Entry No. 66 at 29:15-17; 50:15-17). Mr. Thomas's testimony is plausible, because he has revisited other properties he sued for ADA noncompliance, and because he has articulated a specific desire to buy burgers at one of the restaurants. (*Id.* at 51:12-21; 73:24-74:11). That Mr. Thomas has not visited every store in the Property, or that not every store in the Property is of interest to Mr. Thomas, is not persuasive on the issue of standing because of the variety of businesses available at the Property. Similarly, the fact that Mr. Thomas lives 12 miles from the Property is not dispositive because that has not stopped Mr. Thomas from visiting the Property at least three times in the past. Mr. Thomas's claim that he would visit the Property to see if it became compliant has been accepted by the court as a valid reason for a return visit in other ADA cases. *See Garcia v. MVB Real Est. Inv., LLC*, No. 23-CV-2955, 2024 WL 406777, at *3 (S.D. Tex. Feb. 2, 2024).

This court concludes that Mr. Thomas has standing to bring his suit.

## II.   Americans With Disabilities Act

### A.  The Property was not Altered

"When enacting the ADA, Congress acknowledged that some public entities operating then-existing buildings and structures would be unable to comply with all technical aspects of the new ADAAG regulations." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291 (5th Cir. 2012). The regulations promulgated by the United States Attorney General to implement the requirements of Title II differentiate between structures built prior to the Act taking effect in January 1992 ("existing facilities") and facilities built or altered after January 1992. *Tennessee v. Lane,* 541 U.S. 509, 531–32 (2004); 28 C.F.R. § 35.104. "[A]ccessibility requirements for

12

existing facilities are less stringent and more flexible than for new facilities." *Greer*, 472 F. App'x at 291.

"[I]n the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Lane*, 541 U.S. at 532. The standard for new or altered facilities is more stringent: each facility that is built after January 26, 1992, must be made "readily accessible," and each facility that is altered after that date must be made accessible "to the maximum extent feasible." 28 C.F.R. § 35.151(a)-(b).

Mr. Thomas argues that while "the majority of the Property is existing construction . . . the newly created ADA parking space . . . must be treated as an alteration." (Docket Entry No. 69 at 17–18). The regulations define an alteration as "a change . . . that affects or could affect the usability of the building or facility or any part thereof[,]" such as changing or rearranging structural parts. 28 C.F.R. § 36.402(b). In general, normal maintenance or repainting that does not affect usability does not constitute an alteration. *Id.*

Mr. Thomas points to a case in which a defendant's painting of two new accessible parking spots was considered an alteration as proof that the Property's actions also constitute an alteration. *Tatum v. Doctor's Assocs., Inc.*, No. CV 14-2980, 2016 WL 852458 (E.D. La. Mar. 4, 2016). But the defendant in *Tatum* previously did not have accessible parking spots. The question in that case was "whether converting two parking spots to handicap-accessible spots affects usability." *Id.* at *4. Adding accessible parking spots where previously none existed is plainly a change in usability. Shifting the location of an accessible spot by painting lines on the parking lot pavement does not implicate the same issues of usability. The Property still has the

13

same number of accessible parking spaces—two—and the same number of total parking spaces—88—and so has not been brought nearer to compliance with the ADA.

The regulations provide that existing facilities must make all readily achievable modifications, while altered and new facilities must comply with the ADA to the "maximum extent feasible." 28 C.F.R. §36.402. Repainting two parking spaces to move a handicap accessible space from one side of the parking lot to the other does not change the number of handicap accessible spaces. To conclude that such minor work—restriping parking spot lines—was an alteration under the ADA would lead to an unworkable result: by making a readily achievable modification, an existing facility would change into an altered facility, required to make further modifications beyond those readily achievable until the property complied with the ADA to the maximum extent. The regulations themselves provide "[c]reating designated accessible parking spaces" as an example of a *readily achievable* modification for removing barriers in an existing facility. 28 C.F.R. §36.304(b). The regulations do not contemplate that existing facilities would become altered facilities merely by making readily achievable changes to the property, such as changing the location of an accessible parking space without adding more spaces, altering exit aisles, or changing the grading or ramps. *See id.*

The entire Property is an "existing facility" under the ADA.

### B. Readily Achievable Modifications

Architectural barriers to access in existing facilities are discriminatory when the removal of those barriers "is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). "The statutory language suggests two issues: 1) whether the facilities have architectural barriers; and 2) if so, whether removal of those barriers is readily achievable." *See MacClymonds v. IMI Invs., Inc.*,

No. 05-CV-2595, 2007 WL 1306803, at *4 (S.D. Tex. Apr. 5, 2007); 42 U.S.C. § 12182(b)(2)(A)(iv), (v).

Title III of the ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense," § 12181(9). "Title III does not define 'difficulty' in § 12181(9), but use of the disjunctive—'easily accomplishable and able to be carried out without much difficulty or expense'—indicates that it extends to considerations in addition to cost." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 135 (2005). One of these considerations under the statute is "the impact . . . upon the operation of the facility," § 12181(9)(B). Although the Fifth Circuit has not defined the precise factors for determining whether such an impact has been made, the statute and other circuits have identified the following factors:

> 1) the nature and cost of the required action; 2) the overall financial resources of the facility; 3) the number of employees at the facility; 4) the effect of removal on expenses and resources or the impact upon operation of the facility; 5) the overall financial resources of the responsible entity; 6) the overall size of the business with respect to the number of employees; 7) the number, type, and location of the entity's facilities; 8) the type of operation of the entity, including the composition, structure, and functions of the workforce; 9) the geographic separateness and relationship of the facility to the responsible entity.

*MacClymonds*, 2007 WL 1306803, at *4 (citing 42 U.S.C. § 12181(9); *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1273 (11th Cir. 2006); *Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999, 1002 (10th Cir. 2001)).

Because the Property is an existing facility, it must make modifications that are readily achievable. The Property has already moved one of its handicap accessible spaces to a more accessible location in the parking lot. Mr. Sullivan's proposal to remove the bollards in front of Fu's Garden, (Docket Entry No. 66 at 94:10-23, 132:1-5), is plainly not readily achievable. "[A]

15

structural modification is not readily achievable within the meaning of § 12181(9) if it would pose a direct threat to the health or safety of others." *Spector*, 545 U.S. at 136.

      Mr. Sullivan also testified that the Property needed to convert two regular parking places into handicap accessible spaces, making the number of handicap accessible spaces four. (Docket Entry No. 66 at 139). He also testified that portions of the parking lot and sidewalks had to be regraded. He testified that he believed these changes were readily achievable. In response, the Property put on credible evidence that losing two regular spaces would add to the parking shortage that tenants were already complaining about. The Property put on credible evidence that the two handicap accessible parking spots are rarely used, while there is a shortage of regular parking spots. (*Id.* at 163:1-6). This shortage is a significant worry for the Property tenants, particularly restaurants, who need sufficient parking for their customers even at times of high demand, such as meal times. (*Id.* at 168:4-5). The Property put on credible evidence that making these changes as Mr. Sullivan testified would require weeks of construction, leading to business disruptions that tenants would not tolerate. (*Id.* at 161:3-5). The Property put on credible evidence that the change to the parking lot slope would increase the risk of flooding. (*Id.* at 154:19-25). The Property also credibly argued that it would lose its current grandfathered status with the City of Houston. (*Id.* at 156:18-157:10). All of these effects would cause significant economic harm to the Property.

      The factors for determining if a modification is readily achievable focus on the financial resources both of the entities within the Property and the Property itself. 42 U.S.C. § 12181(9). The Property has stipulated that it has the financial resources to make the changes. (Docket Entry No. 49 at 8). However, the Property has put forward credible evidence showing that it could not withstand the loss of its tenants that would occur if it were to make substantial changes to the

16

Property causing extensive construction that would disrupt the businesses for weeks. (Docket Entry No. 66 at 167:3-168:13). The fact that the Property is grandfathered into its current parking scheme is also persuasive, because modifying the parking lot could create a massive problem for the Property if it were required to create twenty more parking spaces within its limited space. These modifications cannot be classified as "easily accomplishable and able to be carried out without much difficulty or expense," § 12181(9), if they could take a month to complete, could displace or drive out tenants, and would end the Property's grandfathered status with the City of Houston.

The same is not true of the suggested curb modification. Mr. Sullivan stated that either "a dropdown-style curb ramp" or "a parallel-style curb ramp" could accommodate "space constraints" while clearing the access aisle and creating more accessibility with curb guards and changed slope of just the ramp. (Docket Entry No. 66 at 93:13-96:6; 147:10-11). The Property presented evidence that adding a curb ramp to the sidewalk might impact tenants' ability to put out tables (for restaurants) or merchandise (for shops), but Mr. Sullivan testified that this impact could be minimized. (*Id.* at 150:2-15). The Property did not put forward evidence that its restaurants or stores currently utilize this sidewalk space. The modification of the curb would not require closing the Property or its tenants because it would not impact the amount of parking available or the entrances to the restaurants and stores. Further, an architectural expert has testified—and the Property has not rebutted—that the ramp could be added in a manner that was ADA compliant without impacting the usable storefront sidewalk. (*Id.* at 150:13-18). The court finds that this curb ramp modification is "readily achievable."

In lieu of removing barriers, the ADA specifies that "providing curb service or home delivery" is an alternative to barrier removal. 28 C.F.R, §36.305. The Property has shown, and

17

Mr. Thomas has not rebutted, that these methods of service—take out—are available from the restaurant defendants. (Docket Entry No. 66 at 188:18–20). This is a valid and achievable accommodation that the Property has already made and an alternative to making more significant changes to the sidewalks and parking lot.

The court finds and concludes that the Property must make the readily achievable modification of the curb ramp in order to comply with the requirements for an existing facility under the ADA, but that the Property is not liable for creating further accessible parking spaces, regrading the parking lot or sidewalks, or making the other modifications requested by Mr. Thomas.

SIGNED on July 11, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge